Present:  All the Justices

CHARLES BURKETT MOTTESHEARD

OPINION BY JUSTICE A. CHRISTIAN COMPTON

v.  Record No. 971373                    June 5, 1998

LOUIS JOSEPH CASTERN, M.D., ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF SALEM
Willis A. Woods, Judge Designate

In this action alleging physician negligence, the sole question is whether the trial court erred in refusing to permit a party to offer evidence of his general reputation for truth and veracity.

In July 1995, appellant Charles Burkett Mottesheard filed this action for damages against appellees Louis Joseph Castern, M.D., Robert O. McGuffin, M.D., and Sears Curtiss Mull, M.D.  In a November 1996 amended motion for judgment, plaintiff alleged defendants were negligent during a period in September 1993 when they failed promptly to diagnose and treat the condition of septic arthritis of plaintiff's left hip.  According to the record, septic arthritis of the hip is an infectious process in which bacteria attacks the cartilage in the joint.  An "extraordinarily difficult diagnosis," the condition causes the hip joint to sustain "irreversible and significant damage" unless treatment is rendered within five to seven days of the onset of symptoms.

Responding to plaintiff's allegations, defendants admitted they were involved in plaintiff's care but denied they committed any negligence that was a proximate cause of plaintiff's alleged injuries or damages.

Following a lengthy trial, a jury found in favor of the defendants. Overruling plaintiff's motion to set the verdict aside and to award a new trial, the court entered judgment on the verdict. The plaintiff appeals.

A summary of the evidence will set the stage for discussion of the issue of law presented. On September 17, 1993, the plaintiff, 36 years of age, was employed by the State Department of Corrections in Roanoke as a probation and parole officer. After escorting an offender through an office security door, he turned and felt a "pop . . . around the left groin area." He "just walked it off" and continued working. His hip did not "bother" him during the next three days.

During the early morning hours of September 21, plaintiff, a diabetic, was unable to sleep because he "didn't feel what you'd call exactly great." His "temperature" was above normal, and he felt like he "had the flu" but reported to work. While working "seeing offenders" in his office, the plaintiff felt progressively worse. He left the office near midday and called his Blacksburg physician "and told him my leg was hurting." The physician "called in a prescription" for pain relief.

2

The plaintiff's condition continued to worsen and he was taken by a friend to the Lewis-Gale Clinic in Salem where he was seen during the morning of September 22 by defendant Castern, who practices occupational medicine. Castern took a medical history from plaintiff. The physician testified that an accurate history is "absolutely essential" and "of ultimate importance" to a proper diagnosis.

In addition, Castern examined plaintiff, who complained of pain of the left thigh. He was "concerned" about plaintiff's condition because he "had a lot of confusing symptoms and physical findings." Upon consideration of the medical history and the examination, Castern formed a "diagnostic impression" that plaintiff's left thigh pain was due to muscle spasm or muscle strain. Castern prescribed medications for plaintiff and released him. The plaintiff stayed at home for the next two days and "went through living hell" due to pain in his leg.

On September 24, plaintiff was brought back to the Clinic where he was seen again by Castern. The physician found plaintiff "was in more pain and . . . it was further down his leg." Following testing of plaintiff's blood, Castern became concerned that his problems were caused by either "an infectious or an inflammatory process." The plaintiff "still had this left thigh pain" and the physician "tender[ed]" a diagnosis of acute myositis, an inflammatory process that was related to the

3

plaintiff's "injury" on September 17 when he felt the "pop." The physician prescribed additional medication and instructed him to see his Blacksburg physician.

Pain in plaintiff's hip and leg "continued to build" to such a degree he "would go ballistic" whenever he had to move. Near midnight on September 24, the plaintiff was carried to the emergency room at Lewis-Gale Hospital, a separate entity from the Clinic although in the same facility. Plaintiff was seen by defendant McGuffin, who practices emergency medicine. Following examination, the physician concluded: "Leg pain of uncertain etiology possibly related to muscle spasm."

Plaintiff's condition did not improve and on September 25, a Saturday, he presented to Dr. William T. Hendricks, Jr., a family medicine practitioner in Blacksburg, who took a history and examined plaintiff. The physician "thought something was seriously wrong with him." Hendricks "did not suspect an infectious process going on." He made a "differential diagnosis" of aseptic (absence of infection) necrosis of the femoral head, a herniated disk, a torn ligament, or a femoral hernia. He recommended to plaintiff that he report to a hospital emergency room "immediately."

Plaintiff understood that, because the condition may be work related, state regulations required him to return to "Lewis-Gale." His parents attempted to transport him by vehicle

4

to Salem, but the trip had to be interrupted due to plaintiff's pain. At that point, he "didn't feel like living a whole lot longer." Eventually, he was carried to the Clinic.

Defendant Castern saw plaintiff in the Clinic on September 27 and, after examination, referred him to defendant Mull, an orthopedic surgeon, who admitted plaintiff to the Hospital. Due to his condition, plaintiff did not recall seeing Castern on the 27th and remembered little of his "encounter" with Mull. While hospitalized, the plaintiff "went into some sort of septic shock." Later, surgery was performed on plaintiff's left hip, and the diagnosis of septic arthritis was made.

During the trial, plaintiff's recollection of the symptoms he had related when his medical history was being taken and the nature of his examinations was different, in many instances, from what the medical records and the physicians' recollections established. In rebuttal, the plaintiff proffered testimony of his office supervisor who stated that plaintiff's reputation for truth and veracity in the community in which he lives and works is "outstanding." The trial court sustained defendants' objection to this testimony and disallowed it, ruling "that this gentleman's character and reputation has not been put in dispute, is not in evidence, and consequently . . . is not admissible."

On appeal, the plaintiff argues that his "disability resulted from a failure of those attending to timely diagnose and treat an infected hip.  At trial, the key questions were whether the diagnosis should have been made; and, should the condition have been diagnosed in time to save the Plaintiff's hip.  The answers to these key questions depended in large measure on what the Plaintiff had told his treating physicians; specifically, did he accurately identify the area of his pain?"

Continuing, plaintiff contends that his "character was repeatedly put in issue by contrary evidence as to the material fact of his history.  For example, Defendant Castern testified directly to the jury, 'I know [the Plaintiff] described hip pain to us here in his testimony, but when he was with me I did not get a complaint of hip pain.'  Defendant McGuffin; I 'know' I did a straight leg raising test.  The Plaintiff testified emphatically to the contrary.  Defendant Mull told the jury, 'I am surprised at [the Plaintiff's] testimony; he told me he was having pain in his back.'  The Plaintiff testified emphatically and unequivocally to the contrary.  Doctor Castern's expert testified that 'there is an obligation on the patient to be truthful' in connection with the giving of a history.  The Plaintiff, of course, testified emphatically that he was truthful."  (Alterations in original.)

6

Summarizing, plaintiff argues his "character was also repeatedly put in issue by extensive cross-examination about prior inconsistent statements.  Simply put, as a matter of law, 'imputation on [the Plaintiff's] veracity results from the fact of his having contradicted himself,' as time-honored evidence treatises consistently note.  Among other things, the Plaintiff testified that his progressively painful symptoms started on the 21st of September.  The defense sought to prove, by prior inconsistent statements, that his symptoms commenced on the 17th."  (Alteration in original.)

Finally, plaintiff contends he "was denied his one opportunity to rehabilitate his credit with the jury:  that is, by proof that his reputation and character for truthfulness was 'outstanding.'  This was prejudicial error."  We disagree.

Generally, in civil actions evidence of the reputation of the parties for truth and veracity is not admissible.  S. H. Kress & Co. v. Roberts, 143 Va. 71, 77, 129 S.E. 244, 246 (1925).  As an exception to the general rule, Virginia permits evidence of the general reputation of a party or a witness for truthfulness whenever such person's character for truth is attacked either directly or by cross-examination, or by proof of inconsistent statements regarding material facts, or by disproving through other witnesses material facts stated by such person during testimony.  Luck v. Miller, 240 Va. 445, 447, 397

7

S.E.2d 869, 871 (1990) (quoting George v. Pilcher, 69 Va. (28 Gratt.) 299, 315 (1877)).

The key words in the exception are "whenever such person's character for truth is attacked." In the present case, contrary to plaintiff's contention, his character for truthfulness never was attacked. This was made abundantly clear throughout the trial. While the plaintiff's recollection of past events was challenged, there was no attempt to portray him as a liar.

For example, one of defendants' expert witnesses, having reviewed the recorded medical history, stated there was "no reason to believe" that plaintiff had been "other than completely candid with the physicians who examined him." That witness also testified, "I'm not accusing him of not telling the truth." Also, defendant Mull testified, "I believe that he was giving me accurate information . . . I absolutely believed it." Additionally, defendant Castern stated he never believed the plaintiff "was malingering or falsely exaggerating his pain or anything of that nature just to make a workers' compensation claim." Indeed, during plaintiff's rebuttal, defendants' attorney stated before the jury, "We will stipulate, if it will help, that Mr. Mottesheard didn't intentionally try to mislead anyone."

The theme of the defense, in part, was that the plaintiff, because of his physical condition during some of the seven-day

8

period in question, was unable to give an accurate medical history and that, at trial, his recollection differed from what other evidence revealed. For example, plaintiff testified that when he saw defendant McGuffin, he was "so spaced out" that he did not "know really what planet" he was on. Also, he testified that when he saw Dr. Hendricks he was "a mumbling fool" and that the physician may have misunderstood his statements.

This challenge to plaintiff's recollection, and not to his character, was accentuated during closing argument of defendants' counsel. Among other things, he told the jury, "There is no question that a bad thing happened to a good person . . . He is a very admirable person in a lot of ways. He is admirable in the way that he dealt with this. He continued to perform his job and he performed it at a high level. He is rated as high as he can be rated and I think that is significant. We have never suggested to you that he is untruthful. The evidence does not show that and we have never argued that for a minute." Later during argument, counsel said: "[W]e are not suggesting to you that Mr. Mottesheard did not testify truthfully. I'm sure that he testified the way that he thinks these things happened."

Our conclusions based upon study of the trial proceedings are confirmed by the trial judge's comments made when he denied the motion to set the verdict aside. He said: "Mr.

9

Mottesheard's integrity was never questioned. I sat here for two weeks listening to testimony, listening to argument of the counsel on both sides; and I never got the impression that the Plaintiff's reputation in the community [in] which he lived was other than -- or anyone was hinting or implying his reputation was other than -- impeccable." The judge also stated: "Testimony concerning memory skills of all the parties would have been more appropriate [than] testimony as to their character because no one questions their character or ever did."

The plaintiff's reliance upon Luck, supra, and Redd v. Ingram, 207 Va. 939, 154 S.E.2d 149 (1967), is misplaced. In Luck, a personal injury action arising from a motor vehicle accident, we held the trial court erred in refusing to admit testimony regarding the plaintiff's reputation for truth and veracity "after her character for truthfulness had been impeached." 240 Va. at 446, 397 S.E.2d at 870-71. However, in that case, unlike the present case, cross-examination of the plaintiff "was structured to secure statements that admitted or implied" that plaintiff's injuries were the result of a prior accident, that plaintiff had withheld information from attorneys in a previous suit, and that plaintiff misrepresented information about her injuries sustained in the prior accident. Id. at 447-48, 397 S.E.2d at 871.

In Redd, another personal injury case arising from a vehicular accident, this Court held the trial court properly admitted evidence concerning the plaintiff's reputation for truth and veracity. There, defendant attempted to impeach plaintiff's character for truth by cross-examination of plaintiff and by introducing testimony to contradict him. 207 Va. at 943, 154 S.E.2d at 152. In that case, however, defendant attempted to impeach the truth of plaintiff's testimony respecting matters "about which [the plaintiff] could not have been honestly mistaken." Id., 154 S.E.2d at 153. Here, in contrast, impeachment of plaintiff dealt with matters about which he honestly could have been mistaken.

Accordingly, we hold the trial court did not err in refusing to permit plaintiff to offer evidence of his general reputation for truth and veracity. Thus, the judgment below will be

Affirmed.

11